

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

**Eastern District of Kentucky**
**FILED**

NOV 2 7 2006

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 06-190-GWU

DON DUFF,                                                    PLAINTIFF,

VS.                              **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,                    DEFENDANT.

### INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative

denial of his application for Disability Insurance Benefits (DIB). The appeal is

currently before the Court on cross-motions for summary judgment.

### APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial

review of Social Security disability benefit cases:

1.  Is the claimant currently engaged in substantial gainful activity? If yes, the claimant is not disabled. If no, proceed to Step 2. See 20 C.F.R. 404.1520(b), 416.920(b).

2.  Does the claimant have any medically determinable physical or mental impairment(s)? If yes, proceed to Step 3. If no, the claimant is not disabled. See 20 C.F.R. 404.1508, 416.908.

3.  Does the claimant have any severe impairment(s)--i.e., any impairment(s) significantly limiting the claimant's physical or mental ability to do basic work activities? If yes, proceed to Step 4. If no, the claimant is not disabled. See 20 C.F.R. 404.1520(c), 404.1521, 416.920(c), 461.921.

1

Duff

4.    Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months? If yes, proceed to Step 5.  If no, the claimant is not disabled. See 20 C.F.R. 404.920(d), 416.920(d).

5.    Does the claimant have any impairment or combination of impairments meeting or equaling in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments)? If yes, the claimant is disabled. If no, proceed to Step 6.    See 20 C.F.R. 404.1520(d), 404.1526(a), 416.920(d), 416.926(a).

6.    Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work?   If yes, the claimant was not disabled.    If no, proceed to Step 7.    See 20 C.F.R. 404.1520(e), 416.920(e).

7.    Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work--i.e., any other substantial gainful activity which exists in the national economy?  If yes, the claimant is not disabled.    See 20 C.F.R. 404.1505(a), 404.1520(f)(1), 416.905(a), 416.920(f)(1).

Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent to the judicial review of administrative agency action apply.   Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991).  This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into

2

Duff

account whatever in the record fairly detracts from its weight. <u>Garner</u>, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. <u>Bowie v. Secretary</u>, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. <u>Cf. Houston v. Secretary of Health and Human Services</u>, 736 F.2d 365, 367 (6th Cir. 1984); <u>King v. Heckler</u>, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. <u>Hardaway v. Secretary</u>, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. <u>Jones</u>, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. Section 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

3

Duff

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

4

Duff

Step six refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. 416.965(a) and 20 C.F.R. 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most

5

Duff

of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's

Duff

physical and mental impairments.   Varley   v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The administrative law judge (ALJ) found that Duff suffered from degenerative disc disease of the lumbar spine, degenerative joint disease of the left knee (status post arthropathy), obesity and was status post carpal tunnel release. (Tr. 18). Rejecting the residual functional capacity opinion of Treating Physician Mitchell Wicker and Treating Chiropractor Fugate, he concluded that the plaintiff was able to perform a significant range of light level work. (Tr. 20). Since the vocational expert at the administrative hearing identified a number of specific jobs which were still possible, the claim for benefits was denied. (Tr. 21, 23).

The vocational expert had been asked to take into account: (1) no more than light exertional capacity, (2) a need for a sit-stand option, with no prolonged standing or walking of more than an hour without interruption, (3) the ability to only occasionally push/pull or use foot controls with the left lower extremity, (4) the ability to only occasionally climb stairs and ramps, and never to climb ropes or ladders, (5) the ability to only occasionally and non-repetitively bend, twist, stoop, kneel, and crouch, (6) an inability to crawl, (7) an inability to tolerate more than frequent or repetitive handling and gross manipulation, and (8) a need to avoid hazards and concentrated exposure to vibration and cold temperatures.  (Tr. 270). The expert witness indicated that these restrictions would mean that he could not engage in his

7

Duff

past work, but he identified a number of specific alternative job categories. (Tr. 270-271).

The residual functional capacity underlying this hypothetical question was consistent with several pieces of evidence of record.

The plaintiff alleged a disability onset date of January, 2003 (Tr. 52) and cited various musculoskeletal problems as his primary sources of disability (Tr. 65, 80, 84, 92, 103, 244).

The record reveals that the plaintiff came to Dr. Wicker's office in August, 2003, complaining of acute and chronic low back pain, but no other acute problems. (Tr. 147). No specific physical examination abnormalities were noted by Wicker's physician's assistant at that time, but an x-ray was ordered which eventually revealed a decreased disc space at L5-S1. (Tr. 147-148). He was referred to physical therapy. (Tr. 147).

Duff indicated in a form completed for his physical therapist later that month that while pain prevented him from lifting "heavy" weights, he could "manage light to medium weights if they are conveniently positioned" and he implied that he could sit or stand for half an hour to an hour without increasing pain. (Tr. 122-123). The patient requested a discontinuance of the therapy due to increased pain. (Tr. 106).

The patient returned to Wicker's office where, again, no specific objective physical examination findings related to the low back pain were recorded. (Tr. 145). An MRI was ordered, which revealed L4 and L5 degenerative disease with minimal

8

Duff

disc bulging and no stenosis. (Tr. 146). Upon follow-up several days later, "marked

tenderness" of the lumbosacral area was noted, and the plaintiff was advised to

continue with physical therapy and would see a chiropractor in the future. (Tr. 144).

The plaintiff returned to the office in October and early November, with no additional

physical examination findings or testing for the low back pain quoted and no other

musculoskeletal complaints being made. (Tr. 142-143). [1]

The chiropractor following the plaintiff's low back pain indicated in November,

2003 that he should never lift or carry more than 20 pounds, which was consistent

with light level work. (Tr. 131). The chiropractor continued, stating that Duff could

not sustain sitting, standing or laying postures for more than 20 minutes without pain

(Id.); if this statement is interpreted to mean holding the posture for twenty minutes

at a time without interruption, as would be a reasonable construction, this would be

only slightly more restrictive that the sit/stand option selected by the ALJ.

The record contains a letter written by Neurosurgeon Phillip Tibbs to the

chiropractor only days after the aforesaid assessment was signed. In the letter, the

specialist noted that a lumbar spine MRI had shown chronic degenerative disc

problems, but no other problems. (Tr. 140). The doctor noted that the plaintiff's

motor strength was intact, except that his left knee was difficult to evaluate. (Tr.

---

[1]Only a December 18th progress note contained physical examination information which included a reference to minimal tenderness on palpation in the paraspinal area and a "slightly decreased" range of motion of "cervical lumbar" flexion and hyperextension. (Tr. 141). The physician's assistant only diagnosed low back pain, despite the reference to "cervical." (Tr. 141).

9

139).  He recommended referral to a pain clinic, as there were no low back conditions revealed which would be amenable to surgery.  (Tr. 140).

Before the plaintiff could get to the pain clinic, the record was reviewed by Medical Reviewer H. Anzures, who opined that the plaintiff had no "severe" impairment despite his knee and low back complaints.  (Tr. 151).

Exhibit 7F contains the preliminary report on a January, 2004 visit to the Samaritan Hospital Pain Clinic where Jay Grider practiced.  (Tr. 152-153).  He noted that the plaintiff had an antalgic gait, and pain upon palpation in a myotomal radiation pattern.  (Tr. 153).  Conservative treatment was recommended, including muscle trigger point injections and mild weight loss, but no specific functional restrictions were cited.  (Id.).

At this point, another agency medical reviewer examined the record and completed a capacity assessment form.  This called for medium level work, with occasional use of the left lower extremity, occasional climbing, stooping, crouching and crawling, and a need to avoid concentrated exposure to hazards.  (Tr. 155-162).

As of late January, 2004, progress notes from Wicker's clinic reveal that the patient was doing well other than his low back pain and was "carrying on normal activities," with no objective physical examination findings related to his musculoskeletal system.  (Tr. 194).  In March, he again complained of low back pain, but the physical examination findings by the physician's assistant related to

10

concomitant sinusitis complaints, rather than a musculoskeletal examination, and it was recorded that the plaintiff had been "carrying on normal activities". (Tr. 193).

In late April (2004), the patient appears to have complained significantly for the first time of upper extremity complaints, and the problem was said to have been only of a few days' duration. (Tr. 191). No objective findings were recorded by the physician's assistant, but Duff was apparently sent for an EMG/NCV shortly thereafter (Tr. 167). The neurologist conducting the testing indicated that it had revealed bilateral median and ulnar sensory neuropathy and left ulnar motor neuropathy. (Tr. 169). During a May visit to Wicker's clinic, the plaintiff apparently mentioned his upper extremity complaints, but no physical examination data was recorded for any part of the musculoskeletal system. (Tr. 190).

In June, the plaintiff had an initial neurological consultation with David Blake for his hand problems, and was found to have motor and sensory deficit suggestive of carpal tunnel. (Tr. 173-174). Repeat studies done in July were read by the neurologist to indicate definite carpal tunnel syndrome in the right hand, and suspected carpal tunnel on the left. (Tr. 170, 171). The patient was recommended to another physician for surgery. (Id.).

Records for Sherwood Moore, the physician to whom Duff had been referred, indicate that the plaintiff underwent a right carpal tunnel release in late July. (Tr. 176). Follow-up progress notes only exist for a single office visit ten days thereafter, at which time the plaintiff was doing well overall and "much improved, and very

11

pleased with the overall results thus far." (Tr. 175). There is no indication that the plaintiff returned to the doctor thereafter, although he was apparently scheduled for a return visit in six weeks' time. (Id.).

Meanwhile, in late June, the plaintiff had returned to Wicker's clinic. He had not mentioned his upper extremity problems, but focused on his low back pain in one visit, for which, typically, no real related physical examination data was recorded. (Tr. 189). Interesting, only a few days later, the plaintiff came in apparently stating that he was "doing well" and was wanting a Commercial Driver's License physical examination! (Tr. 188).

The plaintiff did not return to the Wicker clinic until mid-September, and for the next few months toward the end of the year, information about musculoskeletal complaints and findings was sparse. On that September visit, other concerns (i.e., a sore throat and the situation stress related to his father's death) were mentioned. (Tr. 187). The main complaint to the physician's assistant the following month related to "stress" and high blood pressure, rather than any musculoskeletal concerns. (Tr. 185). A walking program was recommended and although the progress note did not make any reference at all to neck pain, cervical spine x-rays were ordered. (Id.). These eventually showed a decreased disc space at C5-C6. (Tr. 186). No cervical spine problems were referenced (and low back pain only inferentially) in the next progress note, which focused on his laboratory data for metabolic problems. (Tr. 184). A late November progress note appears to have related mainly to bronchitis,

12

Duff

with no musculoskeletal findings and an indication from the plaintiff that he was "carrying on normal activities." (Tr. 183). Low back pain was only directly mentioned on December 27th, but no physical examination findings were made by the physician's assistant. (Tr. 181).

In January, 2005, this was one of the few occasions when the plaintiff saw a physician at Wicker's clinic. Thomas Karelis was, however, only treating acute sinusitis and made no musculoskeletal findings other than that the plaintiff's gait and station were normal. (Tr. 179). Later that month a physician's assistant recorded familiar contradictory subjective information that the plaintiff's back pain was about the same, but that he was "doing well and carrying on normal activities." (Tr. 178). No musculoskeletal findings were made in this or the next visit, which was devoted to sinusitis. (Tr. 177, 178).

Meanwhile, from February, 2004 through March, 2005, the plaintiff was seeking chiropractic adjustments from Chiropractor Fugate for multiple areas of the spine. (Tr. 197-226). The treatment records mainly record subjective complaints and procedures performed, however. In March, 2002, Lena Fugate made two separate statements. In one, citing a lumbar MRI, she indicated that she did not recommend that her patient "return to any activities that are not required outside of caring for himself." (Tr. 227). In a second one, she recommended that an MRI of the entire spine would be in order. (Tr. 196).

13

Duff

In April, Mitchell Wicker himself completed an assessment form, with the diagnoses of chronic low back pain, metabolic syndrome, depression with anxiety, carpal tunnel syndrome and hypertension. (Tr. 229). He cited severe functional restrictions, which (to the extent it can be discerned specifically) he appears to have related to low back problems and, as far as mental restrictions were concerned, depression and anxiety. (Tr. 229-231).

Looking at these records, it is readily apparent that the plaintiff's argument regarding the assessment of his physical functions is not enhanced by the almost total lack of longitudinal physical examination findings directly by the chiropractors or Wicker's staff. Additionally, since Wicker is the only <u>physician</u> to have completed a residual functional capacity assessment form which suggests greater restrictions than were cited by the ALJ, it is particularly noteworthy that Wicker himself does not appear to have seen the plaintiff at all, and certainly not sufficiently to be considered a "treating physician," so that the plaintiff's case hangs on essentially the opinions of a reviewing physician (e.g., Wicker reviewing the lumbar MRI) and non-physician sources; none of these would have been entitled to more weight than the medical reviewer who was also aware of the lumbar MRI results (Tr. 163), and upon whom the ALJ relied.

Moreover, Duff himself appeared to have made statements which appear inconsistent with disability, such as the admission to his therapist about being able to handle light to moderate weights (Tr. 122), his pursuit of a Commercial Driver's

14

Duff

License in March, 2005 (Tr. 188), his repeated mentioning of "carrying on normal activities" to Wicker's staff (e.g., Tr. 178, 183, 193, 194), and his testimony to the ALJ that he had had no knee pain since he had arthroscopic surgery (Tr. 249-250) and that he had collected unemployment benefits until October, 2003 (Tr. 258).

The decision will be affirmed.[2]

This the ⟨Z 7⟩ day of November, 2006.

G. WIX UNTHANK
SENIOR JUDGE

---

[2]

The undersigned might, remotely, have been persuaded regarding the mental limitations suggested by Wicker regarding stress and maintaining attention and concentration (Tr. 231) since the physician's staff members did diagnose mental disorders on a few occasions, albeit sometimes with no supportive information (e.g., Tr. 178) and no medical reviewer addressed the mental health issue. However, in view of the fact that the plaintiff has not focused on the issue in his brief, the fact that Wicker was only a non-examining source and not a mental health specialist, and the fact that there was some evidence to the contrary (Tr. 131), the undersigned is not persuaded that a remand on this issue would be warranted.

15